UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
DONNELL ALSTON,                      :  13 Civ. 4392 (KPF) (JCF)
                                     :
            Petitioner,              :       REPORT AND
                                     :       RECOMMENDATION
      - against -                    :
                                     :
STEVEN RACETTE,                      :
                                     :
            Respondent.              :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE KATHERINE P. FAILLA, U.S.D.J.:

       Donnell Alston brings this petition for a writ of habeas
corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in
New York State Supreme Court of robbery in the first degree in
violation of New York Penal Law § 160.15(4).  He contends that: (1)
the trial court committed evidentiary errors, depriving him of a
fair trial under the Sixth and Fourteenth Amendments; (2) newly
discovered evidence has created a reasonable probability that he
would have been acquitted; and (3) he received ineffective
assistance of trial counsel when his attorney failed to adequately
cross-examine a witness.  For the reasons that follow, I recommend
that the petition be denied.

Background

      A.    The Crime

       In the fall of 2005, twenty-five year old Amy Spiegel worked
part-time in her mother's store, "Funtiques."  (Trial Transcript
("Tr.") at 336-37).  Funtiques was a small retail shop with one
entrance, with jewelry kept in a display case at the back.  (Tr. at
340-41).

1

On November 26, 2005, Ms. Spiegel opened the store at approximately 12:00 p.m. (Tr. at 338). At 2:00 p.m., a man entered and inquired about some necklaces for his wife. (Tr. at 347). Ms. Spiegel described the man as African-American, "about six feet, maybe a little taller, [with] a shaved head, a goatee and [] wearing a black winter puffy jacket that came to about the knee." (Tr. at 348). He remained in the store for about 30-45 minutes, asking Ms. Spiegel questions and looking at jewelry in the display case. (Tr. at 347). As Ms. Spiegal showed the jewelry to him, he rested his hands on the display case. (Tr. at 350). During that time, there were no other customers in the store. (Tr. at 348). When the man turned to leave, Ms. Spiegel asked him his name, and he responded, "Donnell." (Tr. at 351).

The man returned to the store at approximately 4:00 p.m. on the same day. (Tr. at 353). At that time, there was only one other customer in Funtiques, whom Ms. Spiegel described as "an Asian girl in her mid twenties." (Tr. at 353). Ms. Spiegel briefly engaged the man in conversation. (Tr. at 353). After a few minutes, he told Ms. Spiegel that he had forgotten his cellphone in a coffee shop down the street, and he left to get it. (Tr. at 354).

The man returned a few minutes later. (Tr. at 355). In the interim, no other African-American males entered Funtiques. (Tr. at 355). The other customer was still in the store. (Tr. at 355). At that point, the man told Ms. Spiegel he wanted to look at the necklaces again. (Tr. at 355). She and the man returned to the

showcase, and Ms. Spiegel removed some pieces of jewelry. (Tr. at 355-56). While the man was looking at the jewelry, he again placed his hands on the glass. (Tr. at 356).

As Ms. Spiegel was putting a necklace back in the showcase, the man reached over, grabbed the necklaces, and told her to get down on the ground. (Tr. at 357). At the same time, he pushed forward what appeared to be a gun in his pocket. (Tr. at 357-58).

Ms. Spiegel crouched behind the showcase, as did the other customer. (Tr. at 359). After the man left the store, she dialed 911. (Tr. at 360).

On December 15, 2005, police identified the petitioner, Donnell Alston, as a suspect, based on fingerprints lifted from the scene. (Tr. at 223-24). Police searched for Mr. Alston until May 11, 2006, when he was apprehended in Brooklyn and brought to a police precinct. (Tr. at 226). There, Ms. Spiegel viewed a line-up, following which Mr. Alston was arrested. (Tr. at 234-35).

B.  Trial & Sentencing

Trial commenced on April 18, 2007 before the Honorable William Wetzel and a jury. (Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("Resp. Memo.") at 3). The jury could not reach a unanimous verdict, and Justice Wetzel declared a mistrial on April 20, 2007. (Resp. Memo. at 3).

On September 24, 2007, a second jury trial began before the Honorable Charles H. Solomon. (Tr. at 194). At that trial, Ms. Spiegel testified as described above. The jury also heard testimony from Police Officer Penelope Seaman. At the time of the

incident, Officer Seaman was a member of the New York City Police Department's Evidence Collection Unit, and she collected fingerprint evidence at the scene. (Tr. at 258, 260-61). The prosecutor asked Officer Seaman whether she could "determine how long a fingerprint has been on a surface or how fresh a fingerprint is." (Tr. at 263). Plaintiff's trial counsel, Andrea Moleterri, objected, arguing that the question called for an expert opinion from a lay witness. (Tr. at 263). In response, Justice Solomon asked Officer Seaman whether it was possible to determine how long a print has been on a surface, to which she replied, "[i]f it comes up immediately, it's been there -- it's -- it was just placed there." (Tr. at 263-64). She further explained that if a fingerprint is very "vibrant" or "vivid" when it is pulled from a surface, it is "extremely fresh." (Tr. at 264). Justice Solomon then overruled the objection. (Tr. at 264-65). Officer Seaman was then asked to describe the fingerprints she lifted from the scene of the crime, to which she responded, "Outstanding. Jackpot. I won the lotto. They were nice and fresh, extremely fresh, vibrant, brilliant." (Tr. at 266).

Prior to cross-examination, Ms. Moleterri was granted a sidebar, during which she reiterated her objection to Officer Seaman's testimony regarding the freshness of the prints. (Tr. at 274-81). She argued that Officer Seaman testified as to her opinion regarding a subject outside the ken of the jury, that she had not been qualified as an expert, and that she had not given any scientific basis for her opinion. (Tr. at 275-77). When her

objection was again overruled, Ms. Moleterri asked for an opportunity to recall the witness for cross-examination after noon, to provide her with time to research the scientific bases for Officer Seaman's testimony. (Tr. at 277). Justice Solomon granted this request. (Tr. at 281).

In the afternoon, the prosecutor was permitted to continue his direct examination of Officer Seaman. (Tr. at 311). At that time, the witness testified that "[t]he quality of [a] print[] is whether or not it's a new/fresh print." (Tr. at 315). Ms. Moleterri objected and was again overruled. (Tr. at 315). Officer Seaman continued, explaining that the more recently a fingerprint is left, the more vibrant the print is when it is lifted from the surface. (Tr. at 316). In response, Ms. Moleterri reiterated her objections and argued that the witness had no formal training in the subject of fingerprint dating and that the described method is not accepted in the scientific community. (Tr. at 317-20).

On cross-examination, Officer Seaman acknowledged that there is no scientific way to date a fingerprint. (Tr. at 325). She further testified that she had never received any formal training in determining the age of fingerprints. (Tr. at 326). But she also testified that, based upon their brilliance, the fingerprints at the crime scene had been left within the 12-hour period prior to their being lifted. (Tr. at 329).

During the next recess, Ms. Moleterri requested a mistrial due to Officer Seaman's testimony, or, in the alternative, that her testimony be stricken either in its entirety or specifically as to

5

fingerprint dating.  (Tr. at 411-14).  Justice Solomon denied the
request for a mistrial, but did instruct the jury as follows:

> You heard testimony on Monday from Police Officer Seaman
> that in her opinion the three latent fingerprints which
> she lifted from the glass counter inside 162 Allen Street
> were left there recently, and at one point in her
> testimony she said that it was her opinion that those
> fingerprints were left there within the preceding hours.
> I'm instructing you that this testimony cannot be
> considered by the jury.  I'm striking it from the record.
> Officer Seaman was not qualified to give her opinion on
> this subject, and her opinion is not part of the record
> and cannot be considered by the jury.

(Tr. at 443-44).

The jury also heard the testimony of Christine Peng, the
customer present in Funtiques during the incident.  (Tr. at 434).
She recounted that, while she was browsing, a man entered the store
and was helped by the storekeeper.  (Tr. at 435).  Ms. Peng
described the man as a "tall, black male . . . [d]ark skinned."
(Tr. at 436).  Soon after entering, the man raised his voice and
told the shopkeeper and Ms. Peng to get on the floor.  (Tr. at 438-
39).  Ms. Peng remained on the floor until he left the store.  (Tr.
at 441).  Defense counsel declined to cross-examine Ms. Peng, no
further witnesses were called, and both the prosecution and defense
rested.  (Tr. at 442-43, 446).

The jury found the petitioner guilty of robbery in the first
degree, and the court adjourned the case for sentencing.  (Tr. at
565, 571).

At the initial sentencing hearing, Ms. Moleterri asked
permission to withdraw as counsel for Mr. Alston.  (Transcript
dated Nov. 20, 2007 ("Tr. 11/20/07") at 4, 7).  She represented

that she had received a telephone call from Ms. Peng, who informed her that Ms. Moleterri "didn't do a good job because [she] didn't ask [Ms. Peng] if she could identify [the petitioner] on cross examination." (Tr. 11/20/07 at 3). Ms. Peng related that, had she been asked to make an identification, she would have stated that she did not recognize Mr. Alston as the man who committed the crime. (Tr. 11/20/07 at 3). Based on that information, Ms. Moleterri stated that it would be appropriate to file a motion to vacate the conviction. (Tr. 11/20/07 at 3-5). However, as the attorney who failed to cross-examine Ms. Peng, Ms. Moleterri felt she could not file the motion herself because her effectiveness was in question. (Tr. 11/20/07 at 3-4). The court relieved Ms. Moleterri and adjourned the case. (Tr. 11/20/07 at 7).

On March 4, 2008, Herschel Katz appeared as new counsel for Mr. Alston. (Transcript dated March 4, 2008 ("Tr. 3/4/08") at 1-2). He explained that, despite Ms. Peng's comments, he did not believe that there was a colorable basis for moving to vacate the conviction. (Tr. 3/4/08 at 4-5).

On April 1, 2008, the petitioner and Mr. Katz appeared for sentencing. (Transcript dated April 1, 2008 ("Tr. 4/1/08") at 2). Justice Solomon sentenced the petitioner as a persistent violent felony offender to an indeterminate prison term of twenty years to life. (Tr. 4/1/08 at 15).

C.  <u>Motion to Vacate</u>

On May 18, 2009, the petitioner, represented by the Office of the Appellate Defender, moved to vacate his conviction under New

York Criminal Procedure Law ("CPL") § 440.10. (Motion dated May 18, 2009 ("440 Motion"), attached as Exh. A to Answer). The motion alleged that Mr. Katz, by failing to contact Ms. Peng after her call to Ms. Moleterri, had provided the petitioner with ineffective assistance, and that the statements constituted newly discovered evidence. (440 Motion at ¶¶ 5, 13-15). The court ordered a hearing, at which Ms. Peng testified that she was in Funtiques when the incident occurred. (Transcript dated Feb. 8, 2010 ("Tr. 2/8/10") at 4). She was looking at lamps on the wall when the perpetrator entered, and noticed him because the store was small. (Tr. 2/8/10 at 5). At some point, the man told Ms. Peng and the shopkeeper to get on the floor. (Tr. 2/8/10 at 5). Ms. Peng then proceeded to the back of the store and got down behind the jewelry counter. (Tr. 2/8/10 at 5-6). As she did so, she saw a "three quarters profile of [the perpetrator's] face" from approximately two feet away. (Tr. 2/8/10 at 6). When the police arrived on the scene, Ms. Peng described the man as "about 6 feet, African American man, probably in his later 20s, early 30s," "dark-skinned" with "defined like features (sic)." (Tr. 2/8/10 at 6-7).

Ms. Peng testified that when she saw the petitioner at trial, she had never seen him before. (Tr. 2/8/10 at 16). She then read her sworn affidavit into the record, testifying that the petitioner and the robber looked "extremely different[,] . . . the [petitioner] had a much lighter complexion[,] . . . the [petitioner's] facial features were [] softer [and] . . . the [petitioner] was [] heavier . . . ." (Tr. 2/8/10 at 25). On cross-

examination, Ms. Peng clarified that until the robber told her to
get on the floor, she had not seen the man's face.  (Tr. 2/8/10 at
32-35).  In addition, once on the floor, she kept her head down and
did not see his face again.  (Tr. 2/8/10 at 37-38).  She only knew
he had left the store when she heard the store door close.  (Tr.
2/8/10 at 38).

Ms. Moleterri also testified at the hearing.  She stated that
she did not ask Ms. Peng to identify the man in the store because
she did not know what Ms. Peng would say.  (Transcript dated March
10, 2010 at 15-16).

On September 24, 2010, the court issued an eighteen-page
written decision denying the petitioner's motion.  Justice Solomon
held that Mr. Katz, although remiss in his duty to investigate, was
not ineffective for failing to file a motion to vacate.  (Decision
and Order dated Sept. 24, 2010 ("440 Decision"), attached as Exh.
G to Answer, at 13).  He noted that an attorney is "not required to
make a motion that [he] feels does not have a legal basis."  (440
Decision at 13).  Justice Solomon found that Ms. Peng's testimony
did constitute newly discovered evidence because it "came to light
after [the petitioner] was convicted and could not have been
produced at trial by the defense even with due diligence."  (440
Decision at 14-15).  However, he determined that this new evidence
did not "create[] a probability that had it been received at trial,
the resulting verdict would have been more favorable to [the
petitioner]."  (440 Decision at 15).  First, the court reasoned
that Ms. Peng, "by her own admission," saw the perpetrator's face

for only fifteen to twenty seconds, "at a point when the robber had what Ms. Peng believed was a gun pointed at her and when the robber was yelling at her to get on the floor." (440 Decision at 15). Moreover, Ms. Peng admitted that she had not paid any attention to the man before he ordered her to the floor. (440 Decision at 15). Accordingly, the court found that Ms. Peng had "observed [the robber] for a very brief period of time under circumstances that were extremely stressful." (440 Decision at 15-16).

Justice Solomon further noted that Ms. Peng's brief opportunity to view the man contrasted with the "extremely long period of time" that Ms. Spiegel spent with him on the day of the robbery. (440 Decision at 16). The man and Ms. Spiegel had interacted for almost an hour in a "relaxed setting" before the robbery. (440 Decision at 17). In addition, the man identified himself to Ms. Spiegel as "Donnell," and when he later returned to the store, he acknowledged that he had been there earlier. (440 Decision at 16).

Thus, according to the court, in "stark contrast to Ms. Peng's very brief observations of [the perpetrator]," Ms. Spiegel's identification of the petitioner was "accurate, reliable and based upon her opportunity to observe [the perpetrator] for a lengthy period of time under circumstances extremely conducive to her making a later identification." (440 Decision at 17). Ms. Spiegel's identification, in conjunction with the fingerprint evidence, led the court to conclude that Ms. Peng's testimony "simply would not have affected the outcome of the trial." (440

Decision at 18).

The petitioner sought leave to appeal the court's ruling pursuant to CPL § 460.15, and on November 23, 2010, the Appellate Division granted the application and ordered the appeal to be consolidated with the petitioner's direct appeal. (Certificate Granting Leave dated Nov. 23, 2010, attached as Exh. I to Answer).

D.   <u>The Appeal</u>

The petitioner thereafter appealed to the Appellate Division, First Department from both the judgment of conviction and the Supreme Court's denial of his 440 motion. He contended that the conviction should be vacated based on Ms. Peng's failure to identify him. (Brief for Defendant-Appellant ("Appellate Brief"), attached as Exh. J to Answer, at 26-36). In addition, he argued that the judgment should be reversed because the trial court committed several evidentiary errors, namely, permitting the prosecution to elicit a prior consistent statement to bolster Ms. Spiegel's credibility, allowing Ms. Spiegel to testify about her mother's habit of cleaning the jewelry case each day, and delivering an inadequate and untimely instruction striking Officer Seaman's inadmissible testimony regarding the fingerprints' "freshness." (Appellate Brief at 41-52).

On January 5, 2012, the Appellate Division unanimously affirmed the judgment of conviction, finding that Ms. Peng's post-judgment statements did not create any reasonable probability of changing the result, as required to vacate a judgment pursuant to CPL § 440.10 based upon newly discovered evidence. <u>People v.</u>

Alston, 91 A.D.3d 448, 449, 936 N.Y.S.2d 41, 42 (1st Dep't 2012).
The court reasoned that, despite some inconsistencies in her
testimony, Ms. Spiegel had made an "unusually reliable"
identification, having spoken with the petitioner on three separate
occasions on the day of the robbery.  Id. at 448, 936 N.Y.S.2d at
42.  Ms. Peng's identification, based on a limited opportunity to
observe the perpetrator, was insufficient to support a reasonable
probability of a different outcome.  Id. at 448-49, 936 N.Y.S.2d at
42.  The Appellate Division further held that the trial court's
instruction that the jury disregard the stricken testimony of
Officer Seaman was sufficient to prevent prejudice.  Id. at 449,
936 N.Y.S.2d at 42.  Lastly, the court found the petitioner's
remaining evidentiary claims to be unpreserved and found no basis
to review them in the interest of justice.  Id.

    The petitioner thereafter sought leave to appeal to the New
York Court of Appeals, requesting review of the newly discovered
evidence claim.  (Letters dated Feb. 2, 2012 and Feb. 27, 2012,
attached as Exh. N to Answer).  On March 26, 2012, the Court of
Appeals denied leave to appeal.  People v. Alston, 18 N.Y.3d 954,
944 N.Y.S.2d 483 (2012) (Table).

    Mr. Alston then filed the instant petition.

Discussion

    A.    Standard for Habeas Corpus Review

    Under the Antiterrorism and Effective Death Penalty Act (the
"AEDPA"), 28 U.S.C. § 2254(d),

    [a]n application for a writ of habeas corpus on behalf of
    a person in custody pursuant to the judgment of a State

court shall not be granted with respect to any claim that
was adjudicated on the merits in State court proceedings
unless the adjudication of the claim (1) resulted in a
decision that was contrary to, or involved an
unreasonable application of, clearly established Federal
law, as determined by the Supreme Court of the United
States; or (2) resulted in a decision that was based on
an unreasonable determination of the facts in light of
the evidence presented in the State court proceeding.

"The 'contrary to' and 'unreasonable application' clauses [of § 2254(d)] have independent meanings." Douglas v. Portuondo, 232 F. Supp. 2d 106, 111 (S.D.N.Y. 2002) (citing Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. (alteration in original) (quoting Jones, 229 F.3d at 119). To determine if a decision is an unreasonable application of clearly established federal law under the AEDPA, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. Harrington v. Richter, __ U.S. __, __, 131 S. Ct. 770, 786 (2011). The AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents" but "goes no farther." Id. at __, 131 S. Ct. at 786.

13

In order for a federal court to review a state court decision at all, the petitioner must first have exhausted available state court remedies.  <u>See</u> 28 U.S.C. § 2254(b)(1); <u>Duckworth v. Serrano</u>, 454 U.S. 1, 3 (1981) (per curiam); <u>Aparicio v. Artuz</u>, 269 F.3d 78, 89 (2d Cir. 2001).  Exhaustion requires that the factual and legal basis for each claim be fairly presented to the highest available state court, and that the petitioner use "'all available mechanisms to secure appellate review of the denial of [his] claim.'"  <u>Mayen v. Artist</u>, No. 06 Civ. 14261, 2008 WL 2201464, at *4 (S.D.N.Y. May 23, 2008) (alteration in original) (quoting <u>Klein v. Harris</u>, 667 F.2d 274, 282 (2d Cir. 1981)); <u>see also</u> 28 U.S.C. § 2254(c); <u>Galdamez v. Keane</u>, 394 F.3d 68, 72-73 (2d Cir. 2005); <u>Torres v. McGrath</u>, 407 F. Supp. 2d 551, 557 (S.D.N.Y. 2006).  "In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court."  <u>Daye v. Attorney General of New York</u>, 696 F.2d 186, 191 (2d Cir. 1982) (en banc); <u>accord</u> <u>Jones v. Keane</u>, 329 F.3d 290, 294-95 (2d Cir. 2003).

Finally, even when a claim is not exhausted, a district court may reach the merits to deny the petition.  28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); <u>see also</u> <u>Lurie v. Wittner</u>, 228 F.3d 113, 124 (2d Cir. 2000).

Habeas corpus review is further limited in that a "claim

14

resolved on independent and adequate state procedural grounds is generally not subject to review on habeas." Dunn v. Sears, 561 F. Supp. 2d 444, 452 (S.D.N.Y. 2008) (citing Coleman v. Thompson, 501 U.S. 722, 729-30 (1991)). A state procedural bar qualifies as an "independent and adequate" state law ground if "'the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" Olba v. Unger, 637 F. Supp. 2d 201, 207 (S.D.N.Y. 2009) (quoting Levine v. Commissioner of Correctional Services, 44 F.3d 121, 126 (2d Cir. 1995)). A state procedural rule will generally be adequate to preclude habeas review if it is "'firmly established and regularly followed.'" Lee v. Kemna, 534 U.S. 362, 376 (2002) (quoting James v. Kentucky, 466 U.S. 341, 348 (1984)). Additionally, "[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.'" Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991) (quoting Harris v. Reed, 489 U.S. 255, 263 n.9 (1989)). Nonetheless, "[f]ederal review [of procedurally barred claims] is permissible if the petitioner can demonstrate any one of the following circumstances: (1) actual innocence of the crime charged; (2) cause for the procedural default resulting in prejudice; or (3) that the procedural bar that the state court applied is not adequate." Dunn, 561 F. Supp. 2d at 452-53 (internal citations omitted).

The petitioner timely filed his petition pursuant to the AEDPA's statute of limitations. 28 U.S.C. § 2244(d)(1). I will

15

examine each claim in turn.

B. <u>Evidentiary Issues</u>

The petitioner asserts that the trial court committed "numerous harmful evidentiary errors." (Petition ("Pet.") at 6).

Generally, state evidentiary rulings are a matter of state law not subject to habeas review. <u>Collins v. Artus</u>, No. 08 Civ. 1936, 2009 WL 2633636, at *4 (S.D.N.Y. Aug. 26, 2009). Thus, habeas relief is only available if the petitioner can show that an erroneous evidentiary ruling was "so pervasive as to have denied him a fundamentally fair trial," <u>Severino v. Phillips</u>, No. 05 Civ. 475, 2008 WL 4067421, at *12 (S.D.N.Y. Aug. 25, 2008) (quoting <u>Collins v. Scully</u>, 755 F.2d 16, 18 (2d Cir. 1985)), or "so extremely unfair that its admission violates fundamental conceptions of justice," <u>Dunnigan v. Keane</u>, 137 F.3d 117, 125 (2d Cir. 1998) (internal quotation marks omitted), <u>overruled on other grounds by</u> <u>Perry v. New Hampshire</u>, __ U.S. __, 132 S. Ct. 716 (2012). Additionally, the challenged evidence must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" <u>Id.</u> (quoting <u>Johnson v. Ross</u>, 955 F.2d 178, 181 (2d Cir. 1992)); <u>see Collins</u>, 755 F.2d at 19 (challenged evidence must be "crucial, critical, highly significant" (internal quotation marks omitted)). The materiality of the evidence should be reviewed "in light of the entire record." <u>Dunnigan</u>, 137 F.3d at 125 (internal quotation marks omitted).

The petitioner first challenges the admission of "extensiv[e]"

testimony by Officer Seaman regarding the "freshness" of the fingerprints found inside Funtiques. (Pet. at 6). Mr. Alston argues that the testimony was expert opinion by a lay witness that lacked any scientific foundation. (Pet. at 7-8). Next, the petitioner argues that the trial court's "[u]ntimely and incomplete instruction was insufficient to prevent undue prejudice" resulting from that testimony. (Pet. at 9). Third, he contends that the trial court committed reversible error when it permitted Ms. Spiegel to testify about her mother's habit of regularly cleaning the display cases "without first establishing any prior instances of the purported habit." (Pet. at 9). Fourth, the petitioner maintains that the trial court erroneously allowed the prosecutor to introduce prior consistent statements to bolster Ms. Spiegel's credibility. (Pet. at 10).

Mr. Alston failed to exhaust his state remedies with respect to these claims. While he raised the purported evidentiary errors on direct appeal to the Appellate Division, he did not seek leave to appeal on any of these issues. He is now foreclosed from exhausting those claims because he is entitled to only a single application for leave to appeal. CPL § 460.20; see People v. Nelson, 55 N.Y.2d 743, 743-44, 447 N.Y.S.2d 155, 155-56 (1981). The petitioner's evidentiary claims must therefore be deemed exhausted but are procedurally barred from federal habeas corpus review. See Grey, 933 F.3d at 120-21.

The merits of a procedurally defaulted claim may not be reviewed by a federal court unless the petitioner shows cause for

the default and actual prejudice resulting from it, or that failure to consider the defaulted claim would result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 749-50; see Murray v. Carrier, 477 U.S. 478, 496 (1986) (fundamental miscarriage of justice exception requires showing of actual innocence).

In this case, Mr. Alston has failed to establish either.  He has offered no reason for his failure to assert these claims. Furthermore, his evidentiary arguments are aimed at the sufficiency of the evidence, not his factual innocence. (Pet. at 6-11).  As an instrument for avoiding procedural default, "[a]ctual innocence means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998).  Accordingly, the Court may not address the merits of the petitioner's evidentiary claims.

C.   Newly Discovered Evidence

Mr. Alston next argues that Ms. Peng's testimony at the hearing on the 440 motion, in which she stated that the petitioner looked "extremely different" from the man who robbed Funtiques, constitutes newly discovered evidence.  (Pet. at 13-17).

1.   Exhaustion

Mr. Alston exhausted his state remedies and is not precluded from habeas corpus review on this ground.  He raised this claim before the state Supreme Court, in the Appellate Division, and in his application for leave to appeal to the New York Court of Appeals.

2.   Merits

"'[N]ewly discovered evidence only warrants habeas relief

where it bears on the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state petitioner is not a ground for relief on federal habeas corpus.'" Balkman v. Poole, 725 F. Supp. 2d 370, 375 (W.D.N.Y. 2010) (alteration in original) (quoting Mapp v. Clement, 451 F. Supp. 505, 511 (S.D.N.Y. 1978)).   "'Federal courts are not forums in which to relitigate state trials.'" Herrera v. Collins, 506 U.S. 390, 401 (1993) (quoting Barefoot v. Estelle, 463 U.S. 880, 887 (1983)).

      This is not the first court to consider Ms. Peng's testimony. In connection with the 440 motion, both the Supreme Court and the Appellate Division opined that her testimony, while contrary to to Ms. Spiegel's, did not create a reasonable likelihood that Mr. Alston would have received a more favorable verdict.   Ms. Peng only briefly saw the face of the robber while he was in the store, and the next time she saw the petitioner was several years later.   On the other hand, Ms. Spiegel identified the petitioner as the man who robbed the store after spending considerable time with him prior to the incident.   Therefore, the determination of the state courts was not unreasonable, and habeas relief is not warranted.

      D.   Ineffective Assistance of Counsel

      Finally, the petitioner argues that Ms. Moleterri, his trial counsel, provided ineffective assistance when she chose not to cross-examine Ms. Peng.   (Pet. at 18).   He asserts that, had Ms. Moleterri asked Ms. Peng whether she could identify the petitioner as the man who committed the robbery, she would have responded in

the negative.  (Pet. at 19).

      1.  <u>Exhaustion and Procedural Bar</u>

The petitioner's claim for ineffective assistance of trial counsel was not exhausted.  Although Mr. Alston asserted a claim of ineffective assistance with respect to Mr. Katz, he never did so with repect to Ms. Moleterri, and thus cannot raise it for the first time on habeas corpus review.  Nevertheless, a court may reach the merits of an unexhausted claim that is plainly meritless in order to deny that claim.  28 U.S.C. § 2254(b)(2); <u>see</u> <u>Terrence v. Senkowski</u>, No. 97 Civ. 3242, 1999 WL 301690, at *5 n.4 (S.D.N.Y. May 12, 1999) (exercising discretion to dismiss unexhausted but meritless claims).  That is the appropriate course here.

      2.  <u>Merits</u>

In order to make out a claim for constitutionally ineffective assistance of counsel, the petitioner must satisfy the "'rigorous,'" "'highly demanding'" test articulated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  <u>Pavel v. Hollins</u>, 261 F.3d 210, 216 (2d Cir. 2001) (quoting <u>Lindstadt v. Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001), and <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 382 (1986)).  He must first establish that his counsel's performance was deficient, meaning that it "fell below an objective standard of reasonableness according to prevailing professional norms." <u>United States v. Arteca</u>, 411 F.3d 315, 320 (2d Cir. 2005); <u>see</u> <u>Strickland</u>, 466 U.S. at 687, 690.  Second, the petitioner must "affirmatively prove" that his attorney's deficient performance prejudiced the outcome of the case.  <u>Strickland</u>, 466 U.S. at 687, 693.

"Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla</u> <u>v. Kentucky</u>, 559 U.S. 356, 371 (2010).

Here, Mr. Alston's argument is without merit.  The actions of his trial counsel were well within an objective standard of reasonableness.  The decisions whether to cross-examine a witness and "to what extent and in what manner, are . . . strategic in nature." <u>Dunham v. Travis</u>, 313 F.3d 724, 732 (2d Cir. 2002) (alteration in original) (internal quotation marks omitted). Nothing in the record could have indicated to Ms. Moleterri that Ms. Peng would not identify the petitioner as the man who committed the robbery.  Thus, it was sound strategy for her not to risk having Ms. Peng confirm Ms. Spiegel's identification testimony.

<u>Conclusion</u>

For the reasons set forth above, I recommend that Mr. Alston's petition for a writ of habeas corpus be denied.  Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Katherine P. Failla, Room 2103, 40 Foley Square, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.  Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          May 22, 2014

Copies mailed this date to:

Donnell Alston
08-A-2925
Great Meadow Correctional Facility
P.O. Box 51
Comstock, New York 12821


Joanna Hershey, Esq.
Assistant Attorney General
Office of the Attorney General
120 Broadway
New York, New York 10271

22